22CA2068 Peo v Montoya 09-04-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA2068
Arapahoe County District Court No. 21CR2614
Honorable Eric B. White, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Raul Andres Montoya,

Defendant-Appellant.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE GOMEZ
Freyre and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 4, 2025

Philip J. Weiser, Attorney General, Lisa K. Michaels, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Julieanne Farchione, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Raul Andres Montoya, appeals the judgment of conviction entered after a jury found him guilty of second degree assault (strangulation), third degree assault, and aggravated cruelty to animals, all as acts of domestic violence.  Montoya contends that (1) the prosecution failed to present sufficient evidence to support his assault convictions; (2) the trial court abused its discretion by admitting evidence of prior instances of domestic violence between himself and the victim; (3) the trial court reversibly erred by permitting the prosecutor to commit misconduct at trial; (4) the cumulative effect of these errors requires reversal; and (5) the mittimus doesn't correctly reflect the merger of his third degree assault conviction into his second degree assault conviction.  We disagree with the first four contentions but agree with the final contention.  Accordingly, we affirm the judgment and remand the case with directions to correct the mittimus.

## I.    Background

¶ 2     This case arises from a physical altercation between Montoya and the victim, Y.S., who had a contentious, on-and-off relationship and often got into verbal arguments.

¶ 3     One afternoon in November 2021, the victim asked Montoya to come to her apartment to discuss their relationship. At some point that afternoon, the victim began drinking vodka. It's disputed whether Montoya also drank any alcohol.

¶ 4     What happened that evening was highly disputed at trial.

¶ 5     Montoya claimed that the victim was an "abusive alcoholic." He testified that they were arguing and then the victim punched him and lunged at him with a kitchen knife. He also testified that he feared for his life and that he had his hand on the victim's face and neck, trying to get the knife out of her hand. He sustained a cut on his hand during the altercation. He said that once he got the knife away from the victim, he tried to leave but the victim wouldn't let him. He also said that he didn't see or hear the victim's small dog at any point during the altercation but found the dog unconscious on the floor after the victim ran from the apartment.

¶ 6     However, the victim claimed that she blacked out from drinking and that when she woke up, Montoya was hitting and choking her. She testified that she tried to calm Montoya down and tell him she was sorry until he backed away and she was able to run out of her apartment. She said that she ran to a neighbor's

apartment, where she called a friend, and that when her friend arrived, they went back to the apartment and Montoya "came out with a knife and told me that he already killed [her dog]." The victim ran back to her friend's car and called the police. She later discovered her dog dead.

¶ 7 Following a trial in which the primary issue was whether Montoya had acted in self-defense, the jury rejected that defense and found Montoya guilty of second degree assault (strangulation), third degree assault, and aggravated cruelty to animals, all as acts of domestic violence. At sentencing, the trial court merged Montoya's third degree assault conviction into his second degree assault conviction and sentenced him to a total of seven and a half years in the custody of the Department of Corrections.

## II. Sufficiency of the Evidence

¶ 8 Montoya first contends that the evidence was insufficient to support his assault convictions. Specifically, he asserts that the prosecution failed to present sufficient evidence to disprove his claim of self-defense beyond a reasonable doubt. We disagree.

### A. Standard of Review and Applicable Law

¶ 9    We review claims challenging the sufficiency of evidence de novo, determining whether the evidence presented was sufficient in both quantity and quality to support the defendant's conviction. *McCoy v. People*, 2019 CO 44, ¶ 63. In doing so, we assess whether the evidence, viewed in the light most favorable to the prosecution, supports a reasonable conclusion that the defendant is guilty beyond a reasonable doubt. *People v. Wright*, 2021 COA 106, ¶ 29.

¶ 10    However, we "'may not serve as a thirteenth juror' by considering whether we 'might have reached a different conclusion than the jury.'" *Thomas v. People*, 2021 CO 84, ¶ 10 (quoting *People v. Harrison*, 2020 CO 57, ¶ 33). Thus, we will disturb the jury's verdict only if, despite drawing every reasonable inference in favor of the prosecution, the record is unsubstantial and insufficient to support a guilty verdict beyond a reasonable doubt. *Clark v. People*, 232 P.3d 1287, 1291-92 (Colo. 2010).

¶ 11    Although Montoya raises this challenge as to both of his assault convictions, we address only the conviction for second degree assault because, as we've noted, the trial court merged the third degree assault conviction into that conviction.

¶ 12     A person commits second degree assault (strangulation) if,

> [w]ith the intent to cause bodily injury, [the person] applies sufficient pressure to impede or restrict the breathing or circulation of the blood of another person by applying such pressure to the neck or by blocking the nose or mouth of the other person and thereby causes bodily injury.

§ 18-3-203(1)(i), C.R.S. 2025.

¶ 13     The affirmative defense of self-defense through the use of physical force in defense of a person is governed by section 18-1-704, C.R.S. 2025.  When a defendant raises this defense and the evidence supports giving an instruction on it, self-defense becomes an additional element of the charged offense that the prosecution must disprove beyond a reasonable doubt.  *People v. Gray*, 2025 COA 23, ¶ 25; *Roberts v. People*, 2017 CO 76, ¶ 22.

¶ 14     One way for the prosecution to satisfy its burden is to disprove beyond a reasonable doubt one of the two conditions of self-defense: (1) that the defendant used physical force in order to defend themself from what they reasonably believed to be the use or imminent use of unlawful force by another person; or (2) that the defendant used a degree of force which they reasonably believed to

be necessary for that purpose. *Galvan v. People*, 2020 CO 82, ¶ 22; *Gray*, ¶ 28; § 18-1-704(1).

## B. Application

¶ 15    As an initial matter, the People contend that this issue is unreviewable on appeal. The People reason that a challenge to the jury's rejection of self-defense presents a manifest weight of evidence claim and that such a claim isn't cognizable in Colorado. They specifically rely on an Ohio appellate court's reasoning in *In re N.K.*, 2021-Ohio-3858, ¶ 9:

> "[A] challenge to the sufficiency of the evidence involves the prosecution's burden of production, while a challenge to the weight of the evidence involves the prosecution's burden of persuasion." Under the current version of [the applicable Ohio statute], the burden of proof for the affirmative defense of self-defense has shifted to the state, but the burden of production for all affirmative defenses, including self-defense, remains with the defendant. Because the state does not bear the burden of production with respect to self-defense, "it follows that sufficiency of the evidence is not the proper framework to review whether the state proved the absence of self-defense."

(Citations omitted.)

¶ 16    We decline to express any opinion on whether a defendant can challenge a jury's rejection of their claim of self-defense based on insufficiency of the evidence, as we conclude that the evidence presented in this case is substantial and sufficient to support the jury's rejection of Montoya's claim of self-defense.  At the very least, the evidence is substantial and sufficient to support a finding by the jury that the prosecution disproved the second component of self-defense — that Montoya used a degree of force which he reasonably believed to be necessary for that purpose.

¶ 17    This includes, in particular, the following evidence:

- The victim testified that when she woke up from having blacked out, "I was on the floor and [Montoya] was just choking me and calling out my name, hitting me, and for a second there he slammed me against my mirror and I fell, and I was trying to calm him down[,] telling him that I'm sorry, just kind of to get him to relax a little bit . . . ."

- The victim also testified that Montoya was "smacking me around my face" and that "I didn't hit him back because I knew that if I did, he would probably hit me harder," as "[h]e was stronger."

- The victim further testified that at one point she "played dead" and "stopped moving," and that Montoya kicked her while she was doing so.

- The victim said that while Montoya was choking her, she felt lightheaded, had a hard time breathing, experienced pain when swallowing, had a raspy voice, and urinated on herself.

- The victim also said that she suffered injuries to her back and spine that took several weeks to heal.

- Photographs of the victim taken shortly after the incident show various injuries, including to her chest, her forehead, her eye, her nose, her mouth, her chin and neck, her cheek, and the top of her head.

- The prosecution's forensic medical expert testified that bruises on the victim's chest, forehead, eye, nose, mouth, and other parts of her face and a laceration on the top of her head were consistent with blunt force trauma.

- The forensic medical expert also testified that bruises on the victim's neck and chin were consistent with strangulation.

- The forensic medical expert explained that the victim had petechiae — pinpoint red or brown dots that appear when blood flow is blocked by external pressure, such as during strangulation — in her eyes, under her tongue, and behind her ears.  Moreover, the expert explained, the victim had broken blood vessels in both eyes, which can also be caused by strangulation.

- The forensic medical expert also explained that other symptoms the victim had reported — like lightheadedness, shortness of breath, painful swallowing, changes to her voice, and urinating on herself — were consistent with strangulation.

¶ 18     Even if we were to assume, based on Montoya's appellate argument and cited evidence, that the victim actually came at him first and that he was acting in self-defense, this evidence supports a finding that the force Montoya used against the victim was unreasonable.  Indeed, the evidence supports a finding that Montoya used prolonged force against the victim, striking her multiple times, strangling her, and kicking her, even after she stopped doing anything and "played dead."  Accordingly, the

evidence is sufficient to support both the jury's rejection of Montoya's assertion of self-defense and his conviction for second degree assault (strangulation).

### III. Other Acts of Domestic Violence

¶ 19 Montoya also contends that the trial court abused its discretion by admitting evidence of other acts of domestic violence between himself and the victim under CRE 404(b) and section 18-6-801.5, C.R.S. 2025. We aren't persuaded.

### A. Standard of Review and Applicable Law

¶ 20 We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Abad*, 2021 COA 6, ¶ 8. A court abuses its discretion when it misapplies the law or when its ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Vanderpauye*, 2023 CO 42, ¶ 23.

¶ 21 CRE 404(b)(1) prohibits the admission of evidence of uncharged misconduct for the purpose of proving that a defendant acted in conformity with a character trait on a particular occasion. However, such evidence may be admissible for other purposes, such as to prove motive, intent, absence of mistake, or lack of accident. CRE 404(b)(2).

¶ 22    Moreover, in recognition of the fact that "domestic violence is frequently cyclical in nature, involves patterns of abuse, and can consist of harm with escalating levels of seriousness," the General Assembly has enacted a statute concerning the admission of evidence of other acts of domestic violence between the same defendant and victim in prosecutions involving domestic violence. § 18-6-801.5(1).  That statute reiterates the standards set forth in CRE 404(b).  *See* § 18-6-801.5(3).

¶ 23    For other acts evidence to be admissible under CRE 404(b) and section 18-6-801.5, the trial court must first determine, by a preponderance of the evidence, that the other acts occurred and that the defendant committed those acts.  *See People v. Vasquez*, 2022 COA 100, ¶ 74; *People v. Garner*, 806 P.2d 366, 371-73 (Colo. 1991); *see also* CRE 104(a) (addressing the determination of preliminary questions regarding the admissibility of evidence).

¶ 24    After making these threshold findings, the court must decide whether the evidence satisfies the four-part test enumerated in *People v. Spoto*: (1) it relates to a material fact; (2) it is logically relevant; (3) its logical relevance is independent of the prohibited intermediate inference that the defendant has a bad character and

11

committed the crime charged in conformity with that bad character; and (4) its probative value is not substantially outweighed by the danger of unfair prejudice. 795 P.2d 1314, 1318 (Colo. 1990); *see also Vasquez*, ¶ 75.

## B.    Additional Facts

¶ 25    The prosecution sought to introduce evidence relating to two prior incidents of domestic violence between Montoya and the victim: one from June 2021 and another from September 2021.

¶ 26    The defense objected. After a hearing, the court permitted the prosecution to introduce evidence of the incidents for the purposes of showing "the defendant's mental state, his legal intent to negate self-defense . . . , and modus operandi."

¶ 27    At trial, the prosecution introduced the following evidence regarding the two incidents:

- The victim testified that in June 2021, she and Montoya got into an argument. She said that when she told him to leave, "he put his hands on me and . . . choked me." The victim also said that Montoya made multiple threats during that incident: "That he would kill me. . . . That he would kill my son. . . . He'd kill my dog."

- The prosecution introduced a video recording the victim took following that incident, as well as photos she took of her injuries.

- The victim testified that in September 2021, she and Montoya got into an argument, and she "left work early . . . because he said he was going to come into my apartment and torture my dog." The victim said that the argument got physical as he grabbed her, ripped her sweater, and threw her on the bed. She said that she pushed him off onto the ground, they began fighting on the ground, and while they were on the ground, he started strangling her from behind. The victim told an investigator shortly after the incident that Montoya had asked if she wanted to die and said he would kill her.

¶ 28    Montoya denied that either incident occurred.

¶ 29    The trial court gave a limiting instruction concerning this evidence and the limited purposes for which it could be considered.

## C.    Application

¶ 30    Montoya doesn't challenge the trial court's assessment of the first two prongs of the *Spoto* test. Rather, Montoya asserts that the

court abused its discretion in addressing the last two *Spoto* prongs because (1) the evidence lacked logical relevance independent of the prohibited intermediate inference that he acted in conformity with a bad character and (2) any probative value the evidence may have had was substantially outweighed by the danger of unfair prejudice. *See Spoto*, 795 P.2d at 1318.

¶ 31    We disagree and conclude that the trial court properly admitted evidence of the June and September incidents as other acts of domestic violence between Montoya and the victim.

¶ 32    It was within the trial court's discretion to conclude that the evidence had logical relevance independent of the prohibited intermediate inference because it tended to show intent, negate Montoya's assertion of self-defense, and establish a modus operandi by showing that Montoya's conduct was part of a pattern.  We agree with the trial court that "a carefully tailored instruction advising the jury how they must consider the evidence related to the June and September incidents, which the Court presumes the jury to follow and the law presumes the jury to follow, . . . allow[ed] the jury to make its decision setting aside any inference of conformity with the defendant's bad character." *See People v. Cross*, 2023 COA 24, ¶ 22

14

("[U]nder the third prong of *Spoto*, acts of [the] 'defendant's violent behavior toward the same victim in an ongoing relationship' are admissible in domestic violence cases." (quoting *People v. McBride*, 228 P.3d 216, 227 (Colo. App. 2009))).

¶ 33    It was also within the trial court's discretion to conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.  The June and September incidents occurred close in time to the charged conduct and were similar to — though not as severe as — the charged conduct, thus demonstrating Montoya's intent and modus operandi and negating his assertion of self-defense.  Therefore, the trial court properly concluded both (1) that the evidence was "significantly valuable" in proving Montoya's mental state and disproving self-defense and (2) that any danger of unfair prejudice could be cured with a proper instruction, which the court gave.  *See id.* at ¶ 26 (agreeing with the trial court's assessment that while evidence of earlier acts of domestic violence between the defendant and the victim was "prejudicial to [the defendant], it was not unfairly so").

¶ 34    Accordingly, we conclude that the trial court didn't abuse its discretion by admitting the evidence of other acts of domestic violence between Montoya and the victim.

## IV.    Prosecutorial Misconduct

¶ 35    Montoya next contends that the prosecutor committed reversible misconduct by (1) implying that there is a duty to retreat; (2) improperly referencing CRE 404(b) evidence; and (3) making a generic tailoring argument.  Montoya also argues that the cumulative effect of this alleged misconduct warrants reversal. While we don't condone some of the prosecutor's statements, we conclude that they don't amount to reversible misconduct.

### A.    Standard of Review

¶ 36    "While a prosecutor can use every legitimate means to bring about a just conviction," they have "a duty to avoid using improper methods designed to obtain an unjust result." *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005).  We engage in a two-step analysis when reviewing a claim of prosecutorial misconduct. *People v. Herold*, 2024 COA 53, ¶ 67.  First, we consider whether the prosecutor's conduct was improper based on the totality of the circumstances, and second, we consider whether that conduct

16

warrants reversal under the applicable standard of review. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). We evaluate claims of an improper argument in the context of the argument as a whole and in light of the evidence before the jury. *People v. Geisendorfer*, 991 P.2d 308, 312 (Colo. App. 1999); *Herold,* ¶ 70.

¶ 37    When the defense has preserved an issue regarding the prosecutor's conduct by lodging a contemporaneous objection at trial, we review the trial court's rulings regarding the alleged misconduct for an abuse of discretion. *See People v. Walker*, 2022 COA 15, ¶ 27; *Domingo-Gomez,* 125 P.3d at 1049. Accordingly, "the trial court's rulings on prosecutorial misconduct 'will not be disturbed by an appellate court in the absence of a gross abuse of discretion resulting in prejudice and a denial of justice.'" *People v. Rhea,* 2014 COA 60, ¶ 42 (quoting *People v. Moody*, 676 P.2d 691, 697 (Colo. 1984))).

¶ 38    In the absence of a contemporaneous objection, we review unpreserved prosecutorial misconduct challenges for plain error. *People v. Vialpando*, 2022 CO 28, ¶ 20. "To constitute plain error, misconduct must be flagrant or glaring or tremendously improper, and it must so undermine the fundamental fairness of the trial as

17

to cast serious doubt on the reliability of the judgment of conviction." *Rhea*, ¶ 43 (quoting *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004)).

### B.     Duty to Retreat

¶ 39     Montoya first contends that the trial court reversibly erred by allowing the prosecutor to reference a duty to retreat during cross-examination of Montoya and during closing argument. While Montoya preserved his argument regarding the statement in closing argument, his argument regarding the questioning on cross-examination is unpreserved and thus subject to review for plain error. *See Vialpando*, ¶ 20.[1]

¶ 40     A prosecutor "may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence." *People v. Walters*, 148 P.3d 331, 334

---

[1] To the extent that Montoya claims he preserved his objection to the questioning on cross-examination by later requesting a supplemental jury instruction, we disagree. That request may have preserved an argument that a supplemental instruction was required — an argument Montoya doesn't develop on appeal — but it didn't preserve any argument that the questioning itself was improper. *See People v. Martinez*, 2020 COA 141, ¶ 73 (challenges to witness testimony are subject to plain error review in the absence of a contemporaneous objection to the testimony).

(Colo. App. 2006). However, their "arguments and rhetorical flourishes must stay within the ethical boundaries" our courts have drawn. *Domingo-Gomez*, 125 P.3d at 1048. One of those ethical boundaries is not intentionally misstating the law. *Herold*, ¶ 69.

¶ 41     In Colorado, only initial aggressors must retreat before using force in self-defense. *People v. Monroe*, 2020 CO 67, ¶ 19. Thus, a prosecutor may not argue that a defendant cannot act in self-defense unless they first retreat from an encounter. *Id.* at ¶ 20. Similarly, a prosecutor cannot argue that a defendant's failure to retreat undermines the reasonableness of their use of force. *Id.* at ¶ 29. Such arguments pose a significant risk of confusing the jury. *Id.* at ¶ 32 (citing CRE 403). As our supreme court has explained, "The line between argument that imposes a duty to retreat (a threatened person *should* retreat instead of using force) and argument that undermines the reasonableness of a defendant's use of force (a threatened person *would* retreat instead of using force) is too thin to allow the latter." *Id.* at ¶ 35.

¶ 42     During cross-examination, the prosecutor asked Montoya a series of questions regarding his ability to leave the victim's apartment, where the altercation occurred:

19

Q. *After [the victim] had taken the knife and had it up, why did you not just leave?*

A. How was I going to leave if I was faced with a knife?

Q. *You didn't feel like you could leave?*

A. The knife was in my face.

A. And you said that when you were trying to leave that she stopped you from leaving, correct?

A. Yes.

Q. And that she left instead; is that right?

A. Yes.

Q. She left without her shoes and without her phone, correct?

A. Yep.

Q. *And even though you were trying to leave and she was stopping you, you decided to not leave after she left; isn't that right?*

A. I was packing my things.

. . . .

Q. Even though you were in the act of leaving when she was trying to stop you, you were still packing afterwards?

A. Yes, because I needed my things to leave.

Q. And why did you unpack your stuff there in the first place?

20

> A. She had asked me to come and to stay the night.
>
> Q. Now, at that point you were not intoxicated at all, and you had your car, correct?
>
> A. Yes.
>
> Q. *So you could have left at any time?*
>
> A. No, because I didn't have my things yet.

(Emphases added.)

¶ 43 Defense counsel didn't object to this questioning on the basis now being asserted on appeal. But counsel later tendered a proposed supplemental jury instruction describing the no-duty-to-retreat rule and argued that the prosecutor's questioning was "essentially leading the jury to wonder and think that's appropriate to think about why he didn't just leave, and I don't think the three words addressing no duty to retreat in the original instruction is sufficient." The court rejected the tendered instruction but admonished both parties not to argue to the jury that there was any duty to retreat.

¶ 44 Later, in closing argument, the prosecutor argued, "If [the victim] is so drunk . . . , it makes no sense that this larger, stronger person to not just be able to restrain her and leave." Defense

counsel objected to this statement. The court didn't rule on the objection but reminded the jury to follow the jury instructions and the law provided in those instructions.

¶ 45 The prosecutor's questions and statements fall within the broad scope of arguments the supreme court in *Monroe* prohibited insofar as they seemed to suggest that Montoya should've taken an opportunity to leave the apartment rather than act in self-defense. Accordingly, we conclude that the trial court erred by permitting the prosecutor to imply, both during cross-examination and in closing argument, that Montoya should've left the apartment. However, we conclude that the error doesn't require reversal.

¶ 46 Unlike this case, the trial court in *Monroe* repeatedly overruled objections to the prosecutor expressly arguing that the defendant didn't act reasonably in self-defense because she failed to retreat. *Id.* at ¶¶ 2, 9-11. Also unlike this case, the trial court instructed the jury that it could consider the defendant's failure to retreat as relevant to whether she actually believed she faced an imminent use of unlawful force. *Id.* at ¶¶ 2, 10. The supreme court concluded that, as a result of the arguments and instruction, there was "a significant risk that the jury convicted [the defendant]

because it erroneously believed that her failure to retreat necessarily negated the reasonableness of her use of force." *Id.* at ¶ 37. Such a risk wasn't present in this case.

¶ 47 While the prosecutor asked Montoya about his ability to leave the apartment and suggested in closing argument that Montoya could've simply restrained the victim and left, unlike in *Monroe*, the prosecutor didn't expressly argue that Montoya's failure to retreat undermined his claim of self-defense. Moreover, very few of the prosecutor's questions to Montoya about his presence in the apartment actually related to his ability to avoid the altercation; most of the questions pertained to other issues, like why Montoya was at the victim's apartment at all, why he had unpacked his things there, and why he had stayed to pack his things and clean the mess after the victim left. And the single reference to retreating in closing argument was vague and brief. *See People v. Marko*, 2015 COA 139, ¶ 223 (prosecutorial misconduct in closing argument didn't amount to plain error where the statements at issue "were a small part of the prosecutor's closing argument"), *aff'd on other grounds*, 2018 CO 97.

¶ 48 Moreover, the trial court in this case never expressly indicated to the jury — either through sustained objections or through its own instructions to the jury — that any failure to retreat might undermine Montoya's claim of self-defense. Instead, when the court was presented with an objection to the prosecutor's reference during closing argument, it correctly directed the jury to the instructions, which stated that Montoya had no duty to retreat. We presume that the jury followed that instruction. *See People v. Dominguez-Castor*, 2020 COA 1, ¶ 91 ("Absent a contrary showing, we presume that the jury followed [an] instruction.").

¶ 49 Thus, we conclude that, as it relates to the prosecutor's questions during cross-examination, the error wasn't plain, and, as it relates to the prosecutor's closing argument, the error was harmless.

### C. CRE 404(b) Evidence

¶ 50 Montoya next argues that the trial court reversibly erred by allowing the prosecutor to reference the previously admitted CRE 404(b) evidence for propensity purposes during closing argument. Because Montoya didn't preserve this argument, we review it for plain error, *see Vialpando*, ¶ 20, and discern none.

¶ 51    In closing argument, the prosecutor made the following

challenged statements regarding the CRE 404(b) evidence:

- "Let's talk about whether or not [Montoya] had the intent
  to cause bodily injury. . . . [H]e previously threatened to
  kill [the victim]. *You have this 404(b) evidence that shows
  the mindset of Mr. Montoya from June and September.*"
  (Emphasis added.)

- "The intent to cause bodily injury, like we said
  previously, is from the past incidents as well as the
  arguments that were happening on that night, and *you
  can see from these patterns that he's always told to leave
  and that a lot of times he didn't want to leave, and they
  were always arguing.*"  (Emphasis added.)

- "Now, let's talk a little bit about self-defense . . . . [W]hat
  we have are these patterns.  We have the June incident,
  the September incident, and then the November incident,
  and every single time it's at [the victim's] apartment, and
  she's always telling him to leave and he doesn't.  He gets
  upset and attacks [her].  You can hear it from not only
  the video, but kind of her testimony about how all these

things happened.  If they never happened, why would these stories be so elaborate and accurate?  If — the fact that she had to kind of make up a story to her employer to come home early just to make sure that he could get his stuff, why would she make that up?  Why would she go through all of that hassle to say that she came home and she actually started the wrestling; that she had pushed him off of the bed, and then he turned around and started hitting her and strangling her.  Only reason she said that was because it happened.  *This is his modus operandi*, which means this is his very specific methodology, right, comes over to [the victim's] home and they have an argument and he's told to leave and he doesn't [want] to so he starts to attack her and eventually starts to strangle her." (Emphasis added.)

- "[Montoya] *threatened to kill the dog back on June 23, 2021*, and when [the victim] and [her friend] came back to the apartment to try to retrieve [the dog], he told them [the dog] was already dead." (Emphasis added.)

¶ 52    We perceive no error in allowing these statements.  The prosecutor's references to the other acts of domestic violence between Montoya and the victim were tailored to non-propensity arguments.  Indeed, the prosecutor referenced the very purposes for which the trial court had, within its discretion, allowed the CRE 404(b) evidence to come in: to establish Montoya's mental state, to negate his assertion of self-defense, and to prove his modus operandi.  Thus, the prosecutor did not commit misconduct.  *See People v. Buckner*, 2022 COA 14, ¶ 18 ("Closing argument may properly include the facts in evidence and the reasonable inferences drawn from those facts, as well as the law on which the jury has been instructed.").

## D.    Tailoring

¶ 53    Montoya also argues that the trial court reversibly erred by permitting the prosecutor to make a generic tailoring argument.  Because this argument is unpreserved, we review it for plain error.  *See Vialpando*, ¶ 20.  Again, we discern no error, let alone plain error.

¶ 54    A prosecutor may invite the jury to draw reasonable inferences from the evidence concerning the credibility of witnesses.  *See*

*Martinez v. People*, 244 P.3d 135, 141 (Colo. 2010). Thus, whether a tailoring comment is proper depends on whether it is based on the evidence adduced at trial. *Id.*

¶ 55 A tailoring comment is generic when the prosecutor attacks the defendant's credibility by "simply drawing the jury's attention to the defendant's presence at trial and [their] resultant opportunity to tailor [their] testimony." *Id.* That kind of tailoring comment is improper because it is not based on the evidence and instead "impl[ies] that all defendants are less believable simply as a result of exercising the right of confrontation." *Id.* (quoting *State v. Swanson*, 707 N.W.2d 645, 658 (Minn. 2006)).

¶ 56 In contrast, a tailoring comment is specific, and therefore proper, when the prosecutor points to specific instances in the trial proceedings suggesting that the defendant "actually tailor[ed] [their] testimony to fit that of other witnesses." *Id.* Thus, specific tailoring comments "do not mislead the jury into making a credibility determination based solely on the fact that the defendant exercised [their] right to be present at trial." *Id.*

¶ 57 In closing argument, the prosecutor said,

28

If you remember Mr. Montoya's testimony and
how he was saying that he only just grabbed
[the victim] by the face and by the lower neck,
think about how that even make[s] sense to
grab somebody by the face and the lower neck,
unless he was having maybe two hands on
her.  If he was trying to get that knife out of
her hand, it would make no sense that with
one hand he would be able to actually grab her
face and the lower part of her neck.  The only
reason he said that was because he has these
injuries and he has to explain what he can't
deny.  That's the only reason he had to say
that because he's been sitting here listening to
all the testimony that had come in.

¶ 58    This wasn't a generic tailoring argument.  Rather, it was a

specific tailoring argument because it related to Montoya's

explanation of his and the victim's injuries.  And, contrary to

Montoya's contention, the prosecution's argument was tied to

reasonable inferences drawn from the testimony at trial.

Accordingly, we perceive no misconduct.

E.    Cumulative Error from Prosecutorial Misconduct

¶ 59    Montoya contends that even if "no single instance of

misconduct, standing alone, mandates reversal, the cumulative

effect of the prosecutorial misconduct constituted plain error

requiring reversal."  *See Buckner*, ¶ 20 ("If we find multiple

instances of prosecutorial misconduct, we 'must carefully review

whether the cumulative effect of the prosecutor's statements so prejudiced the jury's verdict as to affect the fundamental fairness' of the trial." (quoting *Domingo-Gomez*, 125 P.3d at 1053)).

¶ 60 While we concluded that the trial court erred by allowing the prosecutor to imply that Montoya had a duty to retreat before engaging in self-defense, we also concluded that the error didn't warrant reversal. Because we discern no other error, there weren't numerous instances of prosecutorial misconduct requiring reversal.

## V. Cumulative Error

¶ 61 Montoya additionally contends that the cumulative effect of all the alleged errors deprived him of a fair trial, thus requiring reversal of his convictions. We aren't persuaded.

¶ 62 Although a single irregularity in a criminal trial may be deemed harmless, "[n]umerous formal irregularities . . . may in the aggregate show the absence of a fair trial, in which event a reversal would be required." *People v. Sauser*, 2020 COA 174, ¶ 106 (alteration in original) (quoting *Howard-Walker v. People*, 2019 CO 69, ¶ 24). But we won't reverse a conviction on this basis unless the cumulative effect of more than one error "substantially

30

prejudice[d] the defendant's right to a fair trial." *Id.* (quoting *People v. Whitman*, 205 P.3d 371, 387 (Colo. App. 2007)).

¶ 63 "The doctrine of cumulative error requires that numerous errors be committed, not merely alleged." *Id.* While we identified an error in Montoya's trial — the prosecutor's reference to a duty to retreat — we concluded that the error didn't warrant reversal. Accordingly, there weren't numerous errors in Montoya's trial requiring reversal.

## VI. Correction of the Mittimus

¶ 64 Finally, Montoya contends, the People concede, and we agree that the mittimus needs to be corrected.

¶ 65 As we've noted, the trial court merged Montoya's third degree assault conviction into his second degree assault conviction. However, the mittimus lists third degree assault as a separate conviction.

¶ 66 Accordingly, we remand the case to the trial court to correct the mittimus to accurately reflect the merger of Montoya's third degree assault conviction into his second degree assault conviction.

## VII. Disposition

¶ 67     The judgment is affirmed, and the case is remanded to the trial court with directions to correct the mittimus.

JUDGE FREYRE and JUDGE MEIRINK concur.